## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2020, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Termination of the Parent-Child Relationship of Mal.C.B. and Mak.C.B. (Minor Children); <br><br> T.C. (Mother), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | June 26, 2020 <br><br> Court of Appeals Case No. 20A-JT-3 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Kurtis Fouts, Special Judge <br><br> Trial Court Cause No. 79D03-1904-JT-47 79D03-1904-JT-48 |

**Pyle, Judge.**

# Statement of the Case

[1] T.C. ("Mother") appeals the termination of the parent-child relationships with her twin sons, Mal.C.B. ("Mal.C.B.") and Mak.C.B. ("Mak.C.B.") (collectively "the twins"), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the twins' removal or the reasons for placement outside Mother's home will not be remedied; (2) a continuation of the parent-child relationships poses a threat to the twins' well-being; and (3) termination of the parent-child relationships is in the twins' best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationships, we affirm the trial court's judgment.[1]

[2] We affirm.

# Issue

Whether there is sufficient evidence to support the involuntary termination of Mother's parental rights.

# Facts

[3] Mother is the parent of the following children: (1) daughter, M.C., who was born in July 2013 and who is in a guardianship with maternal grandmother in Chicago; (2) son, K.C.B, who was born in July 2015 and who is also in a

---

[1] The twins' father's ("Father") parental rights were also terminated. However, Father is not a party to this appeal.

guardianship with maternal grandmother in Chicago; (3) twin sons, Mal.C.B. and Mak.C.B., who were born in June 2016 and who are the children involved in this appeal; (4) son, Ma.C., who was born in June 2017, and who is in a guardianship with Mother's sister in Georgia; and (5) daughter, T.C., who was born in November 2018 and who lives with Mother.

[4] The twins, who were born prematurely, weighed a little more than one pound each at birth. They were placed on ventilators and remained in an Illinois hospital for more than three months before they were discharged to Mother and Father. The twins and their parents subsequently moved to Lafayette, Indiana to "get away from the environment" in Chicago." (Tr. Vol. 2 at 154). Parents and the twins moved in with family members. M.C. and K.C.B., who were already in a guardianship with maternal grandmother, remained in Chicago.

[5] In April 2017, Father was charged in Illinois with aggravated sexual assault. Mother remained at her family members' home in Lafayette with the twins. The home was over-crowded and had no hot water. In May 2017, maternal grandmother allowed three-year-old M.C. to visit Mother. After boiling water for M.C.'s bath, Mother set the pots down on the bathroom floor and left the room. According to Mother, M.C. went into the bathroom and spilled the water on herself. M.C. sustained second and third degree burns to over 60% of her body, including her abdomen, back, genitals, left leg, and left arm. Although staff at Riley Children's Hospital believed that the burns looked as if M.C. had been dipped and held in the boiling water, no criminal charges were filed.

During its investigation of M.C.'s injuries, DCS removed the twins from Mother's home because of inadequate housing and safety concerns for the twins. DCS placed the twins in foster care. At the time of their removal, the twins were underweight, and the backs of their skulls were flat. In addition, the almost one-year old twins could not roll over or crawl. They sought comfort from each other rather than from adult caregivers.

DCS filed a petition alleging that the twins were Children in Need of Services ("CHINS") in May 2017. Mother admitted that the children were CHINS, and following an August 2017 dispositional hearing, the trial court ordered Mother to: (1) complete a parenting assessment and follow all recommendations; (2) obtain and maintain stable employment and housing; (3) participate in parenting time; (4) remain drug free and submit to random drug screens; and (5) participate in case management services.

In October 2017, DCS filed a motion asking the trial court to find Mother in contempt for failing to comply with the CHINS dispositional order. Mother admitted that she had visited the twins only one time in three months and that she had failed to participate in parenting education and case management services. In November 2017, the trial court found Mother in contempt and ordered her to serve four days in jail.

In April 2018, DCS filed a second motion to find Mother in contempt for failing to comply with the CHINS dispositional order. Mother had missed several supervised visits with the twins and had not participated in the court-

ordered parenting education and case management services. The trial court again found Mother in contempt and ordered her to spend thirty days in a work release program.

[10] Two months later, in June 2018, DCS filed a petition to terminate Mother's parental relationships with the twins. DCS subsequently dismissed the petition to give Mother additional time to participate in services. In November 2018, Mother and several service providers worked together to create a 30/60/90-day plan leading to the reunification of Mother and the twins. Each thirty-day increment in the plan had specific goals for Mother to complete, including supervised visitation with the twins, home-based case management services to assist Mother in finding suitable housing and employment, and a parenting skills curriculum. Mother, however, failed to successfully complete the plan.

[11] At some point in early 2019, Mother moved back to Chicago. In the spring of 2019, Mother moved to Georgia. In April 2019, DCS filed another petition to terminate Mother's parental relationships with the twins. Mother returned to Lafayette in June 2019 and asked DCS to allow her to re-engage in services.

[12] DCS referred Mother to Amanda Schaeffer ("Schaeffer") at Promising Futures Incorporated for parenting education and case management services and to Serena Wahl ("Wahl") at Lifeline Youth and Family Services. Mother met with Schaeffer four times and then missed four appointments in August 2019, leading Schaeffer to close the referral. Mother told Wahl that she was relocating to Chicago.

[13] At the October 2019 termination hearing, DCS Family Case Manager Shawna Yoder ("FCM Yoder") testified that the reasons for the twins' removal had not been remedied. Specifically, FCM Yoder testified that Mother "ha[d] not shown the ability to care for these children or have a bond with these children[.] She had many opportunities that we could assist her with, and she didn't take advantage of them." (Tr. Vol. 2 at 39). At the time of the termination hearing, Mother had not seen the twins in almost a year. FCM Yoder also testified that termination of Mother's parental rights was in the twins' best interests and that the twins' foster parents planned to adopt them.

[14] CASA Staff Advocate Brenda Gochenour ("CASA Gochenour") also testified that termination was in the twins' best interests. CASA Gochenour further explained that the twins were:

> two little guys that have developmental needs and some special needs[.] They need to have consistency and stability and to make sure they get to their appointments and to their therapies and do the things that the doctors are recommending to let these children grow and lead normal lives.

(Tr. Vol. 2 at 145). According to CASA Gochenour, this was the first case that she had had "where extra chances were given to parents." (Tr. Vol. 2 at 146).

[15] Testimony at the termination hearing also revealed that the twins were thriving in foster care. They had a strong bond with their foster parents and had gained weight. In addition, the flatness on the back of their heads was becoming rounder. Pediatric physical therapist Jamie Stormont-Smith ("PT Stormont-

Smith"), who has worked with the twins and their developmental delays, testified that she has seen the twins make progress in the following areas: (1) poop smearing; (2) sleep patterns; and (3) eating issues. As an example, PT Stormont-Smith explained that Mak.C.B. had been making progress on his tendency to eat to the point of vomiting, and Mal.C.B. had been making progress on his tendency to avoid food and refuse to eat. According to PT Stormont-Smith, an environment that supported the twins' needs was critical. She agreed that the twins would "need ongoing, extra attention in the future to help them develop and progress." (Tr. Vol. 2 at 114). PT Stormont-Smith also testified that she believed that the foster parents would be able to identify any new issues that would arise and would continue to work with the twins.

[16] At the time of the hearing, Father had been convicted of the aggravated sexual assault charges and was incarcerated in Illinois. He testified remotely and asked the trial court to "give [Mother] another chance[.]" (Tr. Vol. 2 at 153). Mother also testified at the hearing. When asked if there was anything that she wanted the trial court to know, Mother responded as follows:

> I basically just want you to know this whole case is just a bunch of B.S. The twins were not in any harm's way. They were not neglected. I am not a bad parent and this case went on for too long for nothing and all over some services. I really feel like the twins should be placed back with me. I am their Mother. And just like they keep saying that I don't have a bond with them. They didn't have a bond with the foster parents either when they took them away from me. They didn't know them either. They are still young, and we can still establish our bond back. They can still get to know me. That's all.

(Tr. Vol. 2 at 184-85).

[17] In December 2019, the trial court issued a detailed order terminating Mother's parental relationships with the twins. Mother now appeals the terminations.

## Decision

[18] Mother argues that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[19] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the

evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[20] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[21] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in the twins removal or the reasons for placement outside Mother's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to the twins' well-being.

[22] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the twins' removal or the reasons for their placement outside Mother's home will not be remedied.

[23] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to

changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[24] Here, the twins were removed from Mother's home because of inappropriate housing and safety concerns. Our review of the evidence reveals that Mother failed to comply with the CHINS dispositional order. Specifically, Mother was twice held in contempt for failing to comply with the order. DCS filed a termination petition in June 2018 and then dismissed it to allow Mother to re-engage in services. Service providers worked with Mother to create a plan that would lead to the reunification of Mother and the twins, and Mother failed to follow it. After the the second termination petition was filed in April 2019, DCS again provided Mother with additional services when she asked for them. After receiving the services, Mother failed to comply with them. During the course of the proceedings, Mother has shown no ability to care for the twins or have a bond with them, and she has refused to participate in services that would have enhanced her ability to do so. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in the twins' removal would not be remedied. We find no error.

[25] Mother also argues that there is insufficient evidence that the termination was in the twins' best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship

is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[26] Here, our review of the evidence reveals that the twins have developmental delays. They require on-going extra attention as well as a supportive environment. FCM Yoder and CASA Gochenour both testified that termination was in the twins' best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the twins' best interests. There is sufficient evidence to support the terminations.

[27] Affirmed.

Bradford, C.J., and Baker, J., concur.